13250

BRADLEY v. METROPOLITAN LIFE INSURANCE CO.

(160 S. E., 721)

Messrs. *Hemphill & Hemphill* and *Elliott, McLain, Wardlaw & Ellliott,* for appellant,

*Messrs. Gaston, Hamilton & Gaston,* for respondent,

October 2, 1931.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE JOHN W. CREWS.

This action was commenced by service of summons and complaint on August 25, 1927, which complaint was duly answered. The cause came on for trial before Judge J. Henry Johnson and a jury April 8, 1929. At the call of the case for trial and before the commencement thereof, attorneys for appellant moved the Court for an order requiring respondent to elect whether he would go to trial on contract or tort. The presiding Judge refused this motion by appellant, ruling that the respondent did not have to elect because he construed the complaint to state only one cause of action, viz., a fraudulent breach of contract. Thereupon respondent said: "That is what we elect to stand on." At the conclusion of respondent's testimony appellant moved the Court for a nonsuit upon the grounds set out in the record, including the ground that there was a total absence of testimony tending to establish fraud. This motion was refused. At the conclusion of all the testimony appellant moved for a directed verdict upon the grounds set out in the record, which was also refused. Appellant then submitted in writing to the pre-

siding Judge certain requests to charge which were refused. The case was after argument of counsel then submitted to the jury under instructions from the presiding Judge as set out in the record and the jury rendered the following verdict: "We find verdict in favor of plaintiff. Actual damages. One Hundred Eighty-six Dollars plus Forty Dollars and Seventy cents interest. Punitive damages Two Thousand Dollars."

Thereupon appellant moved the Court for a new trial upon the grounds set out in the record, which was refused, except that the presiding Judge required respondent to renounce claim to a small portion of the interest given by jury which respondent did. Upon the verdict as reformed judgment was duly entered. Due notice of appeal from the rulings of the presiding Judge, his charge to jury, refusal to grant a new trial, and from the judgment, was entered within the time required by law.

The evidence introduced at the trial of the cause establishes the following facts:

On August 21, 1925, an agent of Metropolitan Life Insurance Company by the name of Pearson visited the home of Cornelius Bradley, who was at that time residing in Gastonia, N. C. The said Cornelius Bradley had two daughters, who resided with him at said place, whose names were: Lula Hafner and Ensley Bradley. The Bradleys are humble mill people. The insurance agent, Pearson, appears to have known the Bradley family sufficiently well to make (at least once) extended visits and enter into lively and friendly discourses with the members thereof.

After visiting with the family an hour or so on August 21, 1925, he succeeded in securing the applications of Lula Hafner and Ensley Bradley for life insurance policies commonly known as "industrial policies." In the case of Ensley Bradley, application was made for a policy which paid $186 upon death of insured in consideration of a weekly premium rate of 10 cents. Lula Hafner died some time prior to the

death of Ensley Bradley and the company duly paid the policy on her life.

Ensley Bradley died in February, 1926, at Fort Mill, to which place the Bradley family had previously moved. The policy issued upon the life of Ensley is the one now in question.

There are thirty-four exceptions. We do not deem it necessary to consider the assignments of error separately, but will state the principles that will dispose of all the exceptions.

The salient questions are:

1. Was there a contract of insurance in force?

2. Was there a breach of this contract accompanied by fraud, making a fraudulent breach of contract?

3. Did the agent, Adcock, act within the scope of his authority when he committed the alleged fraudulent acts of obtaining possession of the insurance policy and receipt book by deceit?

4. Should the presiding Judge have directed a nonsuit for the defendant upon the grounds set out in the record?

5. Should the presiding Judge have directed a verdict upon the grounds set out in the record?

The cause of action was named, by the presiding Judge, action for fraudulent breach of an insurance contract.

The theory of plaintiff's case and plan of trial appears to be that the insurance company's refusal to pay a valid insurance policy on the life of Ensley Bradley constituted breach of an insurance contract. The manner of obtaining possession of the insurance policy and receipt book from Cornelius Bradley, administrator of the estate of Ensley Bradley, constituted fraud. The insurance company challenges the charge of breach and denies a fraudulent act connected therewith, and denies that the acts of the agent, Adcock, were within the scope of his authority.

The Court agrees with the presiding Judge in his interpretation of the complaint as setting forth only one cause of

action, and the case will be treated as an action for damages for fraudulent breach of contract.

It appears not to be a disputed fact that on August 21, 1925, the appellant insured the life of one Ensley Bradley by issuing to her what is commonly known in insurance circles as an "industrial life insurance policy," payable at death to her estate.

It is earnestly and ably argued by appellant that it was justified and had a legal right to refuse payment of claim made by respondents for the face value of the policy because of certain representations and stipulations contained in the application and policy. This refusal to pay, the respondents contend, constituted breach of the policy contract. That portion of the application and provision of the policy under consideration, are aforesaid, is quoted as follows: The application contains this provision: "I hereby declare that the statements recorded above and on the reverse side thereof are true and complete and I agree that any misrepresentation *willfully made shall* render the policy void and that the policy shall not be binding upon the Company, unless upon this date I shall be alive and in sound health."

The following is an excerpt from the policy: "If the insured  *  *  *  has within *two years* before the date hereof been attended by a *physician* for any *serious disease* or complaint on or before said date, has had any *pulmonary* disease  *  *  *  the company may declare this policy void and the liability of the company in the case of such declaration in the case of any claim under this policy shall be limited to the return of the premiums paid on the said policy, as aforesaid."

The appellant relied upon this provision as justification for its refusal to pay the claim and contended that the insured died of pulmonary tuberculosis and a physician on several occasions attended her within two years prior to the date of said policy.

It will be observed that the appellant in presenting its defense to the charge of breach of contract necessarily opened wide the door and let into the controversy the application for the policy and the policy itself, including all its provisions. The two paragraphs hereinabove quoted seem to be the bone of contention between the litigants.

It will not be amiss for the Court to at least examine so much of the application of the policy as is material to the issue of breach of contract, since this is the pivotal point upon which rests the other questions involved. A close scrutiny and analysis of the provisions herein quoted necessarily urge the consideration of the facts, circumstances, and character of the misrepresentations on the part of the insured and the facts and circumstances surrounding the particular disease of which the insured died, to wit, pulmonary tuberculosis. Was there on the part of the insured "any misrepresentations willfully made?" Had the insured been attended by a physican within two years prior to date of policy "for any serious disease or complaint"? Did insured have "any pulmonary disease"? As aforesaid, appellant contends that insured had had within two years a physician to attend her for a "serious disease," also that she died from pulmonary tuberculosis, the serious disease for which she was attended.

The insured agreed that any misrepresentations *willfully* made shall render the policy void. It therefore appears that in order for there to have been fraud as to the preexisting condition of the health of the insured as contended for by appellant, it was incumbent upon it to show that insured willfully, intentionally, and consciously made misrepresentations to the company as to the condition of her health and thereby induced it to deliver the policy to the insured. It manifestly follows that in order for appellant to prevail in its contention on this point, the duty devolved upon it to present in the trial of the case clear and convincing evidence to the same degree as would be necessary to prove and convict of fraud in any other case. Evidently the jury failed to find the evi-

dence in the case clear and convincing that the insured knew or should have known that she was suffering from any serious disease or complaint, or that she knew she had pulmonary tuberculosis, and, in the absence of this knowledge, how could it be said that she "willfully" misrepresented the facts to the insurance company—willfulness, in this connection, involves the conscious and intentional withholding of material facts within the knowledge of the insured.

In the case of *Sligh v. Sovereign Camp, W. O. W.,* 117 S. C., 437, 109 S. E., 279, 281, Associate Justice Fraser, speaking for the Court, had this to say: "Sligh told the examining physician all that the record shows that he knew. So far as the record shows, he was a sound man when the policy was issued. If life insurance policies issued as this was are to be upset after the death of the insured by reason of some fact unknown to the insured, then life insurance policies are liabilities, and not assets." See, also, *Wingo v. New York Life,* 112 S. C., 139, 99 S. E., 436; Id., 155 S. C., 206, 101 S. E., 653.

It is fundamental, of course, that if appellant had a legal right resting within the scope of the provisions of the policy which it could call to its aid and justify itself in refusing the payment of the policy to the estate of Ensley Bradley, there could be no breach, and the respondents case necessarily falls. Legal rights, however, are frequently relative and contingent things, contingent upon the jury's finding that logically connected facts supporting the claim of legal right exist.

It is true the case at bar is somewhat different from the *Sligh case* and the *Wingo case,* in that in those cases there was a medical examination by the company's physician, and in the instant case there was no medical examination. The company evidently anticipating the arrival of the time for payment of the policy before making an active investigation as to condition of health of insured at time of granting and issuing the policy; also evidently relied upon the recommendation of the risk by Agent Pearson in the following

words: "This is to certify that upon the date last above written, I personally inspected the life proposed for insurance, and saw made the signature at the end of Part C and am of the opinion that said life is in good health. I find the pecuniary circumstances and hygienic surroundings satisfactory and the insurance applied for in good faith with the purpose of being continued. I therefore recommend that this application be accepted."

In the case of *Cooley v. Metropolitan Life Insurance Company,* 153 S. C., 280, 150 S. E., 793, 796, wherein was involved the identical stipulations in the application and policy of insurance, Associate Justice Cothran, for the Court, said: "The proposition that the validity of the stipulation depends upon the knowledge of the insured that she was afflicted with a disqualifying disease I do not think can be maintained. If, as a matter of fact, she was at the time so afflicted, which is conceded, and if, as is held in the *Welch case* 124 S. C., 492, 117 S. E., 720, the fact of her being in good health was a condition precedent to the effectiveness of the policy, her ignorance of the fact that she was cancerous could not possibly alter the admitted fact that she was."

Mr. Justice Cothran, in the *Cooley Case,* cited 37 Corpus Juris, 404, and quoted therefrom: "The actual and not merely the apparent health of the applicant is controlling in determining whether he was in good health when the first premium was paid or tendered."

The *Cooley case* might be controlling in the instant case but for the fact that there was no dispute as to whether or not the insured had cancer at the time the policy was delivered. At the conclusion of the trial, both sides, plaintiff and defendant, moved before the trial Judge W. H. Townsend for a directed verdict. Judge Townsend held the stipulations binding upon the insured because there was no dispute in the testimony and no evidence in the case from which more than one inference could be drawn, and, therefore, di-

rected a verdict for the defendant. The plaintiff admitted that the insured was suffering from cancer.

In the instant case there was some evidence sufficient to go to the jury on the question whether or not the insured, Ensley Bradley, had tuberculosis at the time the policy of insurance was issued to her. The testimony on this point is as follows:

"Q. And didn't you state, at that time, that they had the wrong one? 'No; it was the other one that had it?' A. No, sir; I never said that either one of them had it.

"Q. Well, did either one of them have it? A. No, sir.

"Q. Neither one of them had tuberculosis? A. No, sir.

"Q. Neither one of them ever had tuberculosis? A. No, sir.

"Q. Mr. Bradley, whom did you think knows more about that, you or the doctor, about that?

"Mr. Hamilton: I object to that question. Put up the doctor, I will be ready for him.

"The Court: I don't think the question—he doesn't state what the doctor says, I think he may ask him whom he thinks would know about a thing of that kind. I think the answer is self-evident.

"Q. Don't you think the doctor knows more about what a doctor finds, than you? A. He ought to; I don't know whether he does or not, though.

"Q. Mr. Bradley, one thing 1 wanted to get from you, please, sir; you say that Dr. Moore, I believe it was, told you, when you took your daughter, Lula, to the office, that she had asthma? A. Yes, sir."

The weight of this testimony was very properly left by the presiding Judge to the jury for determination.

Another point made by the appellant, which by the Cooley case is declared to be a condition precedent to the validity of the policy issued to Ensley Bradley, is with reference to the attendance upon the insured of a physician within two years prior to the date of the policy.

In this connection there was testimony to the effect that the insured answered the question of the agent correctly; that is to say, that she had had Dr. Moore in attendance upon her within two years just preceding the date of application, but the agent recorded her answer incorrectly.

The testimony of witness Bradley:

"Q. I say, who sold her, who issued the policy? A. Mr. Pearson.

"Q. Did you see him in Court today? A. Yes, sir.

"Q. Where was your daughter when he sold her the insurance? A. Living up above Gastonia, about a mile from Myrtle Mill.

"Q. You heard the conversation between them? A. Yes, sir.

"Q. How long was he at your house that day? A. Hour and a half, I should say.

"Q. What was he doing there so long? A. Well, he generally always stayed and joked awhile with me when he come to collect. I had some insurance with him before that.

"Q. Who suggested the writing of that policy? A. Why, he said let him write it up, and I agreed to it.

"Q. Did you hear the conversation between him and your daughter? A. I heard part of it.

"Q. He ask her any questions? A. Yes, sir, he asked her questions.

"Q. You remember any questions he asked her? A. He asked her how old she was, I recall that. He asked if she had a doctor inside of a year.

"Q. What did she tell him. A. 'Yes, sir.'

"Q. Who did she tell him she had? A. Dr. Moore.

"Q. When did she tell him she had Dr. Moore? A. In April before the policy was written up in August.

"Q. You know whether or not he wrote that in the application, or did you see the application? A. No, sir; I never examined it.

"Q. Have you ever read over the application? A. No, sir; I never have."

The case of *New York Life Insurance Company v. Fletcher,* 117 U. S., 519, 6 S. Ct., 837, 29 L. Ed., 934, is one of the leading cases holding to the doctrine that if a false answer is made by insured, on a material point, where the application is attached to the policy and made a part thereof, the insurer is not estopped from denying liability on the grounds that knowledge to the agent is knowledge to the principal.

Following the *Fletcher case,* there is a long line of cases holding to the same theory, but proceeding principally from the proof that the agent and insured were in collusion and employed jointly in the undertaking of defrauding the insurer.

Probably the principle is best stated in *Centennial Mutual Life Association v. Parham,* 80 Tex., 518, 16 S. W., 316, 319, wherein it is said: "It is ordinarily true that a principal is affected with notice of such facts as come to the knowledge of his agent in the course of his business. When an agent, however, ceases to act for his principal in good faith and through collusion with another, desiring through him to cheat and defraud the principal, practically enters into the service of that other for the purpose of promoting the interest of that person, or the common interest of himself and that other, in fraud of his principal, then the person who so avails himself of the services of such an agent cannot claim that his act or his knowledge in reference to matters to which the fraudulent collusion relates are binding on the person intended to be defrauded. In such a case, the agent *pro hac vice* becomes the agent of the person he collusively serves."

But the great majority of the Courts refuse to follow the doctrine of the *Fletcher case* and hold that where there is no collusion between insured and agent "knowledge of the agent is knowledge of the principal" concerning the busi-

ness at hand. The latter view is in harmony with the law of this State. *Rearden v. Insurance Company,* 79 S. C., 526, 60 S. E., 1106; *Huestess v. Insurance Company,* 88 S. C., 31, 70 S. E., 403.

The burden of proof was on the appellant to establish good faith as justification for its refusal to pay the policy, and, in view of the evidence, the presiding Judge did not err in submitting the questions to the jury.

Did the manner of obtaining possession of policy and receipt book by the agent Adcock constitute fraud?

Whether or not there were property rights in the policy and receipt book under consideration is beside the question. The plaintiff succeeded to all the rights of the insured to the possession of the policy and receipt book and was entitled to enjoy the possession of his *"prima facie* evidence to the right to recover" without interference. In view of the evidence, this Court could not say as a matter of law that the manner in which agent Adcock is claimed to have detained possession of the policy and receipt book was not fraud. It could be.

Part of the testimony is quoted as follows:

"Q. Mr. Bradley, after your daughter's death in February, 1926, did you have any conversation with Mr. Adcock, the agent of Metropolitan? A. Yes, sir.

"Q. What was said by him? A. Why, he come to my house and fixed out the death claim, and said he would have to have my policy. I told him, 'Why, he couldn't get it.' He stayed on; he said he would have to have it before he could get my money. I let him carry it off. He said he would get my money back in ten days or two weeks.

"Q. Did he make any promise to you, or representations to you?

"Q. State whether or not he got possession of it by making any kind of promise? A. He said he would send it off and get my money.

"Q. What else did he say at that time? Objection.

"The Court: Go ahead.

"Q. What else did he say at that time? A. He said if I would let him have the policy and carry it off, he would get my money in two weeks.

"Q. Well, did he get the money? A. No, sir.

"Q. Did you get him the policy? A. Yes, sir.

"Q. Where did you see him next? A. I saw him every week or two, collecting.

"Q. Any demand made on him for the money or policy? A. Yes, sir; I demanded one or the other, the policy or money, and I got neither one; and he said he wasn't going to pay me, and didn't intend to pay me.

"Q. What did he say, if anything, in reference to his intention at the time he got possession of the policy? A. He said he didn't intend to pay me, and the company didn't intend to pay me, and he knew it at the time he took up the policy."

It appears in the record that plaintiff demanded the return to him of the policy and receipt book, but the defendant refused to do so, and not until the present suit was instituted, about two years after proof of death papers were furnished, did the defendant deliver up the policy and receipt book. This was a significant point of the evidence which was proper for the jury to consider.

Misrepresentations of material matters recklessly made as of one's own knowledge without, in fact, knowing whether they are true or not, render the maker thereof liable to one who relies and acts thereon to his injury. *Colvin v. Delaney,* 101 Conn., 73, 124 A., 841; *Parker v. Herron,* 30 Idaho, 327, 164 P., 1013.

"As a general rule, actionable false representations must be relative to existing facts; and if a promise is accompanied with an intention not to perform it, and is made for the purpose of deceiving the person to whom it was made, and inducing him to act, it constitutes fraud." *Lilly v. Barron,* 144 Ark., 422, 222 S. W., 712; *McLean v. Southwestern*

*Casualty Co.,* 61 Okl., 79, 159 P., 660; *Holmes v. Caldwell,* 10 Rich., 311.

"A promise made without any intention to perform it, and merely to induce action by another, is fraudulent so as to be actionable if injury results." *Herndon v. Durham & Southern Railway Co.,* 161 N. C., 650, 77 S. E., 683, 684.

"A false statement as to an existing fact made by one while knowing that he is without knowledge regarding it constitutes fraud." *Berlin Const. Co. v. Hoops,* 185 App. Div., 277, 173 N. Y. S., 117; *Holbrook Grocery Company v. Armstrong,* 97 Vt., 197, 122 A., 458; *Poag v. Charlotte Oil & Fertilizer Company,* 61 S. C., 190, 39 S. E., 345.

"A broken promise does not amount to fraud. But if the party making the promise has no intention, at the time, of keeping it, the promise becomes an actionable misrepresentation." *Adams v. Clark,* 239 N. Y., 403, 146 N. E., 642; *Hansen v. Daniel Hayes Co.,* 152 Minn., 222, 188 N. W., 317; *Smith v. Vosika,* 163 Minn., 12, 203 N. W., 428; *Higginbotham-Bartlett Co. v. Powell* (Tex. Civ. App.), 270 S. W., 193; *Lovell v. Dotson,* 128 Wash., 669, 223 P., 1061.

"Where one promises to do a certain thing, having at the time no intention of keeping his agreement, it is a fraudulent misrepresentation of a fact, and actionable as such." *Hight v. Richmond Park Imp. Co.,* 47 App. D. C., 518; *Haggerty v. Key,* 100 Okl., 238, 229 P., 548; *Haddaway v. Smith* (Tex. Civ. App.), 256 S. W., 965.

Was there a breach accompanied by fraud?

This Court does not agree with the interpretation that the appellant placed on the meaning of the legal phrase "breach of contract accompanied by an act of fraud." The appellant argues that because the act of obtaining possession of the insurance policy, which is the fraudulent act complained of, was committed three months before the refusal of the company to pay the policy, it could not be said that the breach

was accompanied by fraud. The Court does not so understand the legal phrase to mean that the two acts, the act of breach and the act of fraud, must be committed almost simultaneously. There might be a lapse of three months, four months, or longer time between the act of fraud and the breaching act. We know of no rule of law measuring in point of time this distance. It simply means that the two must be coexisting, logically connected, and the one must be attendant upon the other. Without the existence of both, it could not be said that there was a fraudulent breach of contract. This Court does not construe the case of *Welborn v. Dixon,* 70 S. C., 108, 49 S. E., 232, as being in support of the contention of appellant.

Did the agent Adcock act within the scope of his authority?

Ordinarily this is a question of fact for jury, and it is unnecessary to go further than to cite the recent opinion of this Court by Associate Justice Stabler in the case of *Williams v. Commercial Casualty Insurance Company,* 159 S. C., 301, 156 S. E., 871.

It is now well settled by the law of this State that a breach accompanied by fraud of a valid contract will support or warrant the jury in giving punitive damages as well as compensatory damages.

It was not error for the presiding Judge to refuse motion for nonsuit and for directed verdict. It matters not to which direction the Court turns, it is confronted squarely with evidence making right the action of the presiding Judge in referring the case to the jury. Beyond the point this Court has not sufficient power to go.

Appellant lays great stress upon the matters contained in the proof of death papers. It was admitted that the papers were prepared by the agents of the insurer. At no other point in the relation of insurer and insured is there a greater conflict of interest. The insured is dead; the time for pay

has come; the mutual executory promises have ended; the insured may be off guard, innocently and faithfully trusting; the insurer may be arming and gearing himself for battle. The battle is unequal, but the jury has decided in favor of the dead from the facts properly left to it by the umpire.

Viewing Judge Johnson's jury charge as a whole, we see no reversible error.

We find no error of law.

The exceptions are therefore overruled, and judgment of the lower Court is hereby affirmed.

Mr. Chief Justice Blease and Messrs. Justices Carter and Stabler concur in result.

Mr. Justice Cothran (dissenting): Assuming what, possibly his Honor the presiding Judge should not have assumed, that the policy of insurance was a valid policy from the time it was issued, I think that his Honor correctly construed the complaint in his charge to the jury, as follows: "I call your attention particularly to the fact that this is not an action like the ordinary action—this is not an action upon the policy of insurance. The ordinary action where a person takes out a life insurance policy, and the company doesn't pay it ordinarily the action is brought upon the policy—the person brings suit—the beneficiary, executor, or any other brings suit upon the policy to recover the amount of the policy; this is not that kind of case; this is not a suit upon the policy for the amount of the policy; *but this is an action for the alleged fraudulent breach of that contract of insurance.*" (Emphasis added.)

It is conceded that the company issued the policy in question, insuring the life of Ensley Bradley; that the premiums were duly paid during the lifetime of the insured; and that she died while the policy was apparently, on its face, of active force.

Two main issues were presented upon the trial of the case, and are, upon this appeal, presented to this Court: (1) Was

there sufficient evidence in the case justifying the submission
to the jury of the issue, whether or not the company
breached its contract with the insured? (2) If that issue
should be determined in favor of the plaintiff, was there suf-
ficient evidence in the case, justifying the submission to the
jury of the issue, whether or not the breach of the contract
was accompanied by such circumstances of fraud on the part
of the company, as warranted a verdict of punitive dam-
ages?

Upon the opening of the case, when counsel for the de-
fendant moved that the plaintiff be required to elect whether
he could proceed to trial upon the contract or upon the tort
alleged the Court announced: "My ruling is, they do not
have to elect; the complaint states only one cause of action,
which I rule to be *an action for fraudulent breach of con-
tract.*" To which Mr. Hamilton, of the counsel for the plain-
tiff, declared: *"That is what we elect to stand on."* And
when his Honor, the presiding Judge, in his charge to the
jury, again so construed the complaint (see quotation
above), no objection was raised to his statement of the is-
sues. So that any cause of action based upon the alleged tort
of obtaining possession of the policy upon a false promise
or misrepresentation, and withholding it from the plaintiff
"until the fire had been put to the company," has been
waived by such election.

It is manifest that the second issue above stated cannot be
reached until after the first issue shall have been decided in
favor of the plaintiff, that the company *has* breached its
contract. It is conceded that the company has refused to pay
the amount of the insurance, but it is obvious that such re-
fusal does not constitute a breach of its contract, if the com-
pany had a legally valid reason for such refusal. That can
only be determined by a review of the evidence in the case.

It appears that on August 21, 1925, the insured Ensley
Bradley, a daughter of the plaintiff Cornelius Bradley,
signed a written application for a policy of insurance with

the defendant company—what was known as an "Industrial Policy"—insuring her life in the sum of $186.00, payable in the event of her death to her estate and calling for a weekly premium of 10 cents.

In her application, and stated to have been as an inducement to the issuance of the policy, she represented that she had never had any of a long list of diseases, among which was "disease of the lungs"; and that she had not been under the care of any physician within three years. The application contained the following declaration: "I hereby declare that the statements recorded above and on the reverse side hereof are true and complete and I agree that any misrepresentation willfully made shall render the policy void and that the policy shall not be binding upon the company unless upon its date I shall be alive and in sound health."

On August 31, 1925, the policy was delivered pursuant to this application. It contained the following statement: "If the insured * * * has within two years before the date hereof been attended by a physician for any serious disease or complaint on or before said date, *has had any pulmonary disease* * * * the company may declare this policy void and the liability of the company in the case of any such declaration, or in the case of any claim under this policy, shall be limited to the return of premiums paid on the policy. * * * "

The insured died on February 18, 1926, and on February 20th the plaintiff filed with the company proofs of death, signed by him, with a certificate of Dr. Desportes, attending physician at the time of her death, and a certificate of Dr. Moore, who had previously attended her, both of which the claimant agreed should be considered as parts of the proofs of death, and which the policy provided should be evidence of such facts as were stated therein in behalf of the company.

In the statement of the plaintiff, he replied to the question "cause of death," by referring the company to "Form 66,"

which was the statement of Dr. Desportes, the attending physician, and in which his reply to this question was "Pulmonary Tuberculosis," the duration of which he placed "from history given" as seven months, which would date back to July, 1925, a month before the date of her application.

In the statement of Dr. Moore, which was also a part of the proofs of death submitted to the company *by the plaintiff,* along with his own statement and that of Dr. Desportes, in answer to the question, "Did deceased ever suffer from any form of tuberculosis?", he replied, "Yes, *I treated her for Pulmonary Tuberculosis in April, 1925*"; that he treated her from April 28, 1925, to May 30, 1925, for tuberculosis.

Both statements of the applicant that she had not had any disease of the lungs and had not been treated by a physician within the two preceding years, are shown by evidence *supplied by the plaintiff* to have been untrue.

It appears incontrovertibly, therefore, that the company had the right to decline payment of the policy *and that therefore there could have been no breach of the contract of insurance.*

It is a significant fact that between the date of the application and the death of the insured, namely, in November, 1925, a sister of the insured died with tuberculosis—a member of the same family.

But, assume, for the argument's sake, that there was evidence of the company's breach of the contract, sufficient to carry that issue to the jury, I find in the evidence not a suggestion which justified the submission of an issue of fraud on the part of the company in such alleged breach. The only circumstance that lends the least degree of color to this suggestion is that the agent Adcock, under a representation that the company would pay the policy, secured the policy from the plaintiff and forwarded it to the company with the proofs

of death *supplied by the plaintiff* and that the company upon demand refused to return it to the plaintiff after declining to pay the insurance.

In the first place, the policy provides for payment *upon surrender of the policy* with the proofs of death. The company surely should not be charged with a fradulent invasion of the plaintiff's right when it demanded what it was entitled to have and what was expressly made by the policy a condition of its payment.

In the next place, the agent Adcock is not shown to have had any other authority than to secure the policy and with the proofs of death submit the matter of payment to the company which he did. The plaintiff would have the Court to hold that notwithstanding the provision of the policy that the existence of tuberculosis at the time of issuing the policy would avoid it, a local collector had the authority to bind the company absolutely to the payment of the policy. Why send the proofs of death in at all, if not to have the company pass upon its responsibility under the policy?

But, it is insisted with vehemence, that the company was guilty of fraud in withholding the policy from the plaintiff. If the company declined payment, it was then that it breached the contract, if there was a breach; and if thereafter it committed a tort by withholding the policy, that was a matter not at all connected with the breach which had already occurred, and for which the plaintiff's counsel expressly waive recourse against the company.

After securing the policy and the proofs of death, with the statements of the plaintiff and the physicians, the company declined payment and so notified the plaintiff not later than April, 1926, as conclusively shown by the letter to the district manager from the company and his communication of its contents to the plaintiff. He knew as early as that that the company was going to contest his claim; *he knew even the number of the policy and its amount.* What possible

324

harm or inconvenience even could come to him from the possession of the policy by the company? He could have sued without it, as the record here shows that his present attorneys did, for they gave notice to the company to produce the policy at the trial of the case *which had been commenced without it.*

I can find no possible justification in the refusal of the defendant's request: "I charge you that if you find from the evidence that Ensley Bradley had tuberculosis prior to August 21, 1925, you cannot find any greater verdict than Two and 50/100 ($2.50) Dollars and interest at seven per cent. from February 28, 1926, to date in favor of plaintiff against defendant."

It went to the marrow of the case, whether there had been a breach of the contract of insurance by the company.

Without adverting to other assignments of error, I am convinced that, not only, as his Honor held on motion for a new trial, the case is a weak one, but that, upon both issues discussed, the defendant's motion for a directed verdict should have been granted. A top with so small a "null" should not be allowed to spin at all.