14789

BARBER v. INDUSTRIAL LIFE & HEALTH INS. CO.

(200 S. E., 102)

*Messrs. McEachin & Townsend* and *Thomas & Thomas,* for appellants,

110

*Messrs. Wm. N. Levin* and *W. Brantley Harvey,* for respondent,

December 12, 1938.

The opinion of the Court was delivered by MR. JUSTICE BAKER.

Since final judgment in the Court of Common Pleas, the plaintiff-respondent, Maude 'Mitchell, died intestate, and Addie Y. Barber was appointed administratrix of the estate of said Maude Mitchell, deceased.

The "Statement" in the Transcript of Record, agreed to by counsel for respondent and appellant, so succinctly sets forth the issues as made by the pleadings; and the result of the trial, we adopt it.

This action was commenced on the 22nd day of October, 1937, for the recovery of $3,000.00 for an alleged breach, accompanied by a fraudulent act, of an insurance contract issued on the life of Philip Mitchell, and in which the respondent was named the beneficiary.

The complaint alleges, among other things, that on the 26th day of November, 1934, the appellant issued and delivered to Philip Mitchell its "straight life" insurance policy No. A 2538892, wherein and whereby, upon the payment by the said Philip Mitchell of a premium of 25 cents a week, the appellant agreed to pay to the beneficiary, Maude Mitchell, the sum of $250.00 at the death of the insured; that from the date of said policy until the death of the insured the respondent paid each weekly premium due on said life insurance policy; that the insured died on the 6th day of September, 1937, while the policy was in full force and effect; that the respondent made claim upon the appellant for the amount of the insurance policy, to wit, $250.00, offering due proof of the death of the insured; that the agent of the appellant refused to accept proof of death and informed respondent that the "straight life" policy, in which respond-

ent was named as beneficiary, was not in force, and that the only policy in force was a "sick and accident" policy No. 6973965, dated June 25, 1934, wherein the death benefits were only $50.00; that upon examination of the receipt book she ascertained that the appellant had fraudulently substituted for the said "straight life" policy its policy No. 6973965; that the appellant has repeatedly refused to consider and pay claim of respondent and has tried to induce respondent to accept the benefits due under said fraudulently substituted "sick and accident" policy, with the intent to cheat and defraud the respondent out of $200.00 benefits that she is entitled to under said "straight life" policy.

The appellant's answer, after denying certain allegations of the complaint, admits: (1) The collection of premiums on a policy on Philip Mitchell until his death on September 6, 1937; (2) the appellant's refusal to accept proof of death and claim under the $250.00 policy; and (3) the appellant's informing the respondent that the $250.00 policy had lapsed, and attempting to pay her a $50.00 sickness and accident policy, the only contract on Philip Mitchell in force at the time of his death; and by way of affirmative defense reiterates the lapse of the $250.00 policy before Philip Mitchell's death, the exercise of the appellant's right, after nonpayment of the premium, to mark the $250.00 policy cancelled, and the issuance of a $50.00 sickness and accident policy, upon which premiums were paid until the death of Philip Mitchell. The answer closes with the request to be allowed to pay into Court $50.00 under the policy admitted by the appellant to be in force.

The case came on for trial before the Honorable Philip H. Stoll and a jury at the Spring term (1938) of the Court of Common Pleas for Beaufort County, resulting in a verdict for the respondent in the sum of $250.00 actual and $1,500.00 punitive damages.

Motion for a new trial was duly made and refused upon condition that the respondent remit upon the record of the judgment $500.00 punitive damages. The respondent hav-

ing immediately complied with his order, judgment was entered for $250.00 actual and $1,000.00 punitive damages.

The appellant in due time served notice of appeal from the trial Judge's rulings, refusal of nonsuit, directed verdict and new trial; and errors in the charge.

Appellant's exceptions allege (a) error in the refusal of the trial Judge to grant a nonsuit on the ground that the testimony is susceptible of only the inference that the policy, the basis of this suit, lapsed because of nonpayment of premiums; (b) error in the refusal to grant a directed verdict as to actual and punitive damages on the same ground; (c) errors of commission and omission in the charge to the jury; (d) error in the exclusion of certain testimony, and (e) error in refusing a new trial.

The exceptions go farther in alleging error with reference to the refusal of the trial Judge to grant a nonsuit and direct a verdict than is warranted by the record. Appellant has confused its grounds for directed verdict with grounds for a new trial in Exception II. In stating the grounds in the exception, as to the refusal to grant a nonsuit and direct a verdict, we therefore limited same to alleged errors directed to matters actually passed upon by the trial Judge. For instance in neither the motion for nonsuit or directed verdict was the motion bottomed upon the ground that respondent had no right of action. The only direct motion for a directed verdict was as to punitive damages, but there can be read into it a motion also as to actual damages, and it was apparently so treated by the trial Judge; and by counsel on this appeal.

The appellant has elected to state the "Questions Involved" relating to the motion for nonsuit and direction of verdict generally; and direction of verdict as to punitive damages, and for a new trial as follows:

"I. A non-suit or direction of verdict should have been ordered because:

"(a) Maude Mitchell had no right of action (Exception II (6)).

"(b) The evidence showed that the policy sued on had lapsed for nonpayment of premiums (Exception 1).

"II. Verdict as to punitive damages should have been directed or a new trial granted on the grounds (Exception II):

"(a) There was no evidence of actionable fraud.

"(b) The defendant proceeded in all respects in accordance with what is believed to be its legal rights."

As to the first sub-division (a) just above set out, the point is not properly before the Court. Neither the motion for a nonsuit nor the motion for directed verdict was upon any ground other than that the policy, the basis of the suit, had lapsed because of nonpayment of premiums.

Our discussion of sub-division (b) on the motion for a nonsuit, or direction of a verdict, is necessarily confined to the direction of verdict. Under the respondent's testimony, a nonsuit could not have been granted.

Respondent was a Negro woman living at Beaufort, and could read "a little." She had a brother, Philip Mitchell, insured with appellant, either under a sick and accident policy, with death benefit of $50.00, or a "straight life" policy carrying death benefit of $250.00. The sick and accident policy was issued Philip Mitchell on June 25, 1934, had the number 6973965, the beneficiary therein named being one, Rosa Ridley. On November 16, 1934, the beneficiary therein was changed to respondent, Maude Mitchell. On November 26, 1934, Philip Mitchell applied to and received from appellant another policy, known as a "straight life," bearing the number A 2538892, with respondent as the named beneficiary. The premium on each of the above policies was 25c weekly.

Respondent testified her brother lived with her at her house; that she had no knowledge that a sick and accident policy had ever been issued her brother; that when the "straight life" policy was delivered to her brother at her home, he handed it to her and said, "Maude, here is the pol-

icy," and she put it in her trunk and kept it; that she paid all premiums thereon until Philip's death, the weekly payments being entered in a receipt book furnished by appellant; that every year a new receipt book was given her, and the old one destroyed; that the receipt books with the exception of the last one showed that she was paying on the "straight life" policy, and that she did not know the number of the policy on which she was paying was shown in the last receipt book different from the policy she had in her possession, until after the death of her brother on September 6, 1937, when she was informed by an agent of appellant at the time she undertook to file proof of claim under the "straight life" policy that this policy had lapsed, and that the only policy in force and effect was a sick and accident policy carrying a death benefit of $50.00; that the receipt book she had at the time of the death of her brother was the only one that bore a number different from the number on the policy she had in her possession. She testified, and there was corroborating testimony, that respondent's brother commenced to complain of heart trouble in December, 1935, and from January, 1936, was unable to do any work; that from time to time he was confined to his bed requiring the attention of a physician, and that the agent of appellant would see him in bed when he came to collect premiums; that the agent never offered her brother any blanks to make claims for sick benefits and her brother filed no such claim; that in September, 1936, her brother went to Boston, Mass., where he remained until his death without filing any claim for sick benefit and she continued to pay the weekly premium on the "straight life" policy; that he continued to suffer from heart trouble in Boston, and did not do any work there. Respondent emphatically denied ever hearing any conversation about the "straight life" policy lapsing, and of having any notice thereof.

The appellant's testimony showed the issuance of two policies as hereinbefore described; the lapse after notice to the beneficiary of the $250.00 policy for non-payment

of premiums; that both Philip and Maude Mitchell paid the premiums at different times, and that Maude Mitchell had notice from January 7, 1935, that the $250.00 policy—the "straight life" had lapsed, and from that time only the number of the sick and accident policy was noted on her premium receipt book. The original record of the collecting agent was introduced showing the lapsing of the "straight life" policy on January 7, 1935. It was admitted that no sickness claims had been filed by Philip Mitchell, but the collecting agent of appellant testified he had never seen him in bed and knew nothing of any sickness.

Under the foregoing testimony, which will be discussed at greater length hereinafter on the issue of punitive damages it was the duty of the trial Judge to submit to the jury the question of actual damages, which involved the intermediate question, in view of all the surrounding circumstances, if the premiums paid should have been applied to the "straight life" policy instead of the "sick and accident" policy. A finding by the jury that the "straight life" policy was not lapsed—that the premiums paid should have been applied to this policy—necessarily resulted in the ultimate question of the amount of actual damages suffered by respondent due to appellant's breach of its contract, the wrongful cancellation thereof, which was, of course, the amount it should have paid under the policy, $250.00.

Should the trial Judge have granted appellant's motion for a directed verdict as to punitive damages?

This question has given the writer hereof grave concern, both upon the testimony and the applicable law. It was the position of respondent throughout this case that the "straight life" policy was in effect at all times including the date of the death of the insured and that there was a fraudulent cancellation of the policy, accompanied by fraudulent acts of the agent of the appellant in substituting the number of another policy, the sick and accident policy, which at one time had been carried by Philip Mitchell, in the last receipt book which had been given her, and in which fifteen

weekly payments had been entered; and by trying to get her to accept a duplicate of the sick and accident policy, and make claim thereunder for the death benefit therein provided of $50.00; and by the appellant, as evidenced by its answer, and the testimony, having actually cancelled the "straight life" policy on its books.

In passing upon this issue, it would appear proper that we briefly refer to the cases cited and relied upon by appellant.

In the case of *Bailey v. North Carolina Mutual Life Ins. Co.*, 173 S. C., 131, 175 S. E., 73, cited by appellant, which was a suit for fraudulently procuring release and cancelling life and disability policy, the insurance company admitted the issuance of the policy and its terms, but denied that the policy had been cancelled prior to the date of the complaint, and that there had been any release of the company's liability thereunder. After setting forth some of the facts of the case as testified to by plaintiff, the then Chief Justice of this Court, the Honorable Eugene S. Blease, author of the opinion, stated [page 74] :

" * * * There being no cancellation of the policy, and no release on the part of the insured of any right she had under its terms, there could not, therefore, have been any damage to the insured on that account. Since there was no cancellation and no release, it follows, of course, there could not have been any fraudulent cancellation, or any release executed on account of the fraudulent conduct of the agent of the company. Accordingly, there was no evidence to sustain in any way the alleged cause of action for either actual or punitive damages, on account of the alleged cancellation of the policy, or the alleged obtaining of the release through fraudulent conduct and representations; and the nonsuit, so far as it affected those claims, was proper. See *Herndon v. Continental Casualty Co.*, 144 S. C., 448, 142 S. E., 648.

"Since the defendant offered no testimony, we do not know what would have been said in the defense of itself

or agent, if any defense was necessary. We judge of the facts entirely, therefore, from the testimony submitted in behalf of the appellant. From that testimony, especially the letter of Prioleau to the insured, we are rather inclined to think that Prioleau had in mind the commission of a fraudulent act. Realizing that, in all probability, his company was going to lose money on the policy carried by the insured, he probably conceived the idea of laying the ground for a cancellation of the policy and securing the consent of the insured to that course. The early institution of the suit, just two days after Prioleau's letter, gave him and his company notice in time that it would not be well for the fraudulent scheme to be carried out. If the insured had patiently waited for a few days, in all probability she would have had a good cause of action on account of the fraudulent conduct of Prioleau."

The case of *Herndon v. Continental Casualty Company*, 144 S. C., 448, 142 S. E., 648, cited by appellant, is not as we view this case, in point. The complaint in that case [page 649] alleged "that after the cancellation of said policy the defendant, its servants and agents received and took and collected the said amount of money from the plaintiff willfully, fraudulently, and unlawfully, with intent to cheat and defraud the plaintiff, and willfully, fraudulently, and unlawfully collected, received, and converted the said money to its own and separate use, etc. The plaintiff further alleges that, although repeated demands have been made upon the defendant to return the said money so collected, the defendant has willfully, fraudulently, and unlawfully failed and refused to return the said money to the plaintiff, to plaintiff's injury and damage in the sum of $3,000.00, and demands judgment against the defendant for that amount." The trial Court overruled a demurrer to the complaint that it did not state facts sufficient to constitute a cause of action. In reversing the trial Court, this Court, through Mr. Associate Justice Carter as the organ, had to say the following:

"* * * As we view the complaint, it does not state a cause of action. Since, under the allegations of the complaint, the defendant collected the premiums on the policy for the period of time in question and did not refund the same, the alleged cancellation of the policy by the defendant on August 1, 1924, was illegal, and the policy was of force, and had the plaintiff died or received an injury within that period of time, October 27, 1919, to November 10, 1925, the defendant would have been liable under the policy for the amount stipulated therein. It is a recognized rule of law when a policy of insurance is issued, and the premiums paid and not refunded, such policy cannot be cancelled by the insurance company, whether notice of such attempted cancellation be given the policyholder or not. The fact that the complaint contains an allegation that the premiums in question were fraudulently collected does not state a cause of action, when it appears from the facts alleged and the law applicable thereto, as in this case, that the policy was of force during the period of time when the collection of the premium was made. The addition of the words 'cheat and defraud,' etc., in the allegations, in connection with the other allegations contained in the complaint, does not in our opinion make out a cause of action. * * *."

In *Kelly v. Guaranty Fire Ins. Co.*, 176 S. C., 275, 180 S. E., 35, the language of and the principle involved in the *Herndon case* was approved and adopted, but the only question passed upon as presented by the exceptions was this [page 36] : "Was it proper for the Court to charge the jury that if the respondent was improperly induced to surrender the policy the liability of the appellant upon the policy ceased to exist as a matter of law?" This Court answered the question in the negative, and in so doing, quoted from the *Herndon case,* and also cited *Hollings v. Bankers' Union,* 63 S. C., 192, 41 S. E., 90, 32 C. J., 1245.

The facts in the case of *Cunningham v. Independence Ins. Co.,* 182 S. C., 520, 189 S. E., 800, were that Independence Insurance Company undertook to substitute one of its

policies for a policy issued the insured, Dora Cunningham, by the Liberty Life Insurance Company, and marked on its policy that the Liberty policy had been cancelled. Insured at all times refused to surrender her Liberty policy, and filed and collected sick claims thereunder; and testified that all premiums which she paid were on the Liberty policy. She brought suit, not against the Liberty Life Insurance Co., but against Independence Ins. Co., for the alleged cancellation and breach of the contract of insurance issued her by the Liberty Life Insurance Company.

This Court in passing upon the correctness of the ruling of the trial Court in refusing a motion for a nonsuit, had this to say [page 802] :

" * * * Under the terms of the policy, it could be cancelled only for nonpayment of premiums, and this policy was therefore in full force and effect, notwithstanding the written statement on the back of the Independence policy, and the verbal statement of the inspector for appellant, because, as stated in *Hollings v. Bankers' Union,* 63 S. C., 192, at page 198, 41 S. E., 90, 92, 'Parties making a contract, they must stand to it, and one party cannot revoke the contract at his will.' "

The opinion then, after stating the allegations of the plaintiff's complaint in *Herndon v. Continental Casualty Co., supra,* quoted at some length from the opinion in that case.

Every circumstance in this case points to the conclusion that respondent and the insured were acting upon the assumption that the "straight life" policy was the one being kept alive. The insured was sick for a period of approximately one and two-thirds years, during which time he was from time to time confined to his bed. He in no instance filed a claim under the sick and accident policy. Other members of the same family, and possibly household, had sick and accident policies with appellant, and filed claims for sick benefit. The "straight life policy" was the only policy which respondent had in her possession, or knew any-

thing about, according to her testimony; and the number in the receipt books, except the last one, corresponded with the number of the "straight life" policy. We are, of course, stating the testimony from respondent's side, and while this last bit of evidence rather taxes our credulity, yet it was a scintilla of evidence to be passed upon by the jury. Under our form of jurisprudence, we are not a fact finding body.

Except for the testimony of respondent that only the last receipt book showed a number different from the number carried by the "straight life" policy, we doubt if there would have been sufficient evidence to take the case to the jury on the issue of punitive damages. The appellant carried for a short length of time two policies on Philip Mitchell, the weekly premium on both policies being the same. The sick and accident policy was the oldest. During the time that both policies were of force both named the same beneficiary, and both policies were lapsible for the nonpayment of premium. It would appear, therefore, that unless there was an election on the part of the insured as to which policy it was desired that appellant keep in force, especially since respondent was the beneficiary in both policies, or the circumstance that when the "straight life" policy was delivered, it was in the presence of the agent of appellant, handed to respondent by the insured, and that respondent paid all premiums thereafter which were paid to appellant by reason of insurance carried on Philip Mitchell, the appellant had the legal right to lapse either of the policies. The appellant recognizes the importance of this "election" or "non-election," and has appealed from the ruling of the trial Judge in which he excluded a conversation between appellant's agent and the insured with reference to the lapsing of the "straight life" policy. We will pass upon the exception relating to this later herein.

Of course, there is a vast difference between negligently or unlawfully and wrongfully doing an act, and fraudulently committing an act. It is for this reason that we have hereinbefore stated that except for the testimony of re-

spondent that the number of the policy in the last receipt book given her was changed from the policy which she had in her possession to the number of the sick and accident policy, it would have been the duty of the trial Judge to grant the motion for a directed verdict generally.

In refutation of such testimony, in addition to a definite denial, there was introduced in evidence the original lapse sheet of the "straight life" policy made by the appellant's collecting agent on January 7, 1935. The other records of appellant establishing the lapsing and cancellation of the "straight life" policy on or about January 7, 1935, were ruled inadmissible since the person who made the entries was not in Court to testify to same. However, another agent of appellant, whose duty it was to check the books of the local or collecting agents, had testified that the records of appellant showed this policy lapsed as of January 7, 1935.

Notwithstanding the record made by the collecting agent of appellant of the lapsing of the "straight life" policy on January 7, 1935, under the case of *McLeod v. Life Ins. Co. of Va.*, 179 S. C., 349, 184 S. E., 116, the testimony of respondent that all receipt books except the last carried the number of the "straight life" policy, made an issue for the jury; and the issue of fraud accompanied by a fraudulent act.

Appellant's Exception III alleges error in the trial Judge's charge to the jury in four particulars. No. 3 does not comply with the rules of this Court, and is too general to be discussed.

No. 1. In stating the issues, the trial Judge told the jury that the complaint alleges "that the company switched policies on her and gave her a sick and health policy." The appellant takes the position that the complaint merely alleges that a paper substitution by number only on the premium receipt book was made by the defendant's agent.

The trial Judge told the jury he would not take up their time again reading the pleadings to them, but that they

would have the complaint and answer in the jury room, and could read them then if they so desired; that he would state briefly and in simple language the contentions of the litigants. It was following this that he made the statement above. In our opinion this exception is hypercritical. The complaint alleged a substitution of the number of a sick and accident policy carrying a $50.00 death benefit, in respondent's receipt book for the number of the "straight life policy," the effect of which would have been to substitute one policy for another, granting that the former receipt books carried another numbered policy. Therefore, the error complained of dwindled to the use of the word "switched" for "substituted." It will also be noted that it was a sick and accident policy, not a sick and health policy.

No. 2. "That the company has no right or authority to change it without the consent of the insured, and very frequently the beneficiary." This statement was just as suggestive that in this case the consent of the beneficiary did not have to be procured. If counsel deemed the general statement of the law prejudicial, it was the duty of counsel to call to the attention of the trial Court that such consent of the beneficiary was not necessary in this case.

No. 4. We have carefully read the requests to charge refused. The charges as prepared, would have been a charge on the facts, and were properly refused for that reason.

Appellant, upon oral argument of the case, abandoned its Exception IV.

Appellant's Exception V is as follows: "That the trial Judge erred in ruling out Defendant's agent's conversation with Philip Mitchell notifying him of the lapse of the two hundred fifty ($250.00) dollar policy, after the Plaintiff had introduced her conversations with the deceased."

In *Trimmier v. Thomson*, 41 S. C., 125, 19 S. E., 291, cited by appellant, we find the following language [page

293]: "* * * it has always seemed to us that a proper construction of section 400 of the Code will allow a plaintiff to testify fully as to communications and transactions with a person deceased, if and whenever the personal representative of such deceased persons opens the door by giving testimony herself to such a communication or transaction. See the language of the latter part of section 400 of the Code." This case would have been authority for appellant's position if the conversation had with or statement made by Philip Mitchell had occurred, at the time respondent testified (without objection) that her brother handed her the policy and said "Maude, here is the policy," but such testimony did not "open the door" for the admission of statements by the deceased weeks thereafter, although concerning the same policy of insurance.

All exceptions are overruled, and the judgment appealed from is affirmed.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES BONHAM and FISHBURNE concur.

MR. JUSTICE CARTER did not participate on account of illness.